[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13431
_____

D.C. Docket No. 3:10-cr-00264-TJC-JBT-10


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CLIFFORD WILLSON,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 31, 2013)

Before MARTIN and HILL, Circuit Judges, and HUCK,[*] District Judge.

PER CURIAM:

Clifford Willson appeals his conviction for one count of conspiracy to

_____

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

commit mail and wire fraud, in violation of 18 U.S.C. § 371. He argues that the government failed to present sufficient evidence at trial to support his conviction. Alternatively, Clifford argues that the evidence at trial did not show that he participated in the single overarching conspiracy charged in the indictment.[1] Instead, Clifford suggests that he was a member of a smaller and more limited conspiracy. After careful review and with the benefit of oral argument, we affirm.

I.

On November 3, 2010, a grand jury sitting in the Middle District of Florida returned an indictment charging Clifford and fifteen others with conspiring to commit mail and wire fraud, in violation of 18 U.S.C. § 371. Fourteen of the sixteen defendants pleaded guilty, including Gregory W. Willson, who was the mastermind of the conspiracy and Clifford's son. Clifford and his grandson, Gregory M. Willson, proceeded to a joint jury trial on February 6, 2012.[2]

The evidence at trial showed that Gregory W. Willson operated a branch of Access E Mortgage ("Access E"), a firm which helped clients apply for loans so they could purchase a home or refinance their mortgage. Around late 2005, Gregory W. Willson and his co-workers at Access E devised a plan to help homeowners who had been served with a notice of foreclosure. Access E would

_____

[1] We refer to this Appellant as Clifford in order to distinguish him from his son and grandson, both of whom are discussed here and are also named Willson.

[2] At the close of the government's case, the district court granted Gregory M. Willson's motion for a judgment of acquittal.

2

offer to find a "straw buyer" who would take out a loan and purchase the property so that the homeowner would not lose his home while improving his credit. The idea was that the original homeowner would be able to buy the property back 18–24 months later, after his credit had sufficiently improved.

On its face, the plan seemed like a win-win proposition for all involved. The homeowners would be able to avoid foreclosure and continue living in their homes while rebuilding their credit. Access E benefited by collecting fees from the loan disbursements, using the rest of the disbursements to make mortgage payments. Finally, the buyers received an "investor fee" of three percent of the loan amount, including any costs typically associated with closing a real estate transaction.

In order for the scheme to work, however, Access E had to convince mortgage companies to lend the buyers money at a favorable interest rate. To that end, Access E submitted fraudulent loan applications and closing documents on behalf of the buyers so that they would qualify for low interest rates. For example, some loan applications inflated the income and assets of the buyers. Other loan documents listed jobs and other sources of income that the buyers did not have. Virtually every loan application claimed that the buyer was going to occupy the property, even though it was understood that the original homeowner was not going to move out. These fraudulent statements were all calculated to ensure that

the mortgage companies would approve the loans with the lowest-possible interest rates.

Clifford, whose appeal is the only one we consider here, was recruited by his son to serve as a buyer for two of the thirteen properties in the scheme. One property was located at 2007 Farm Way in Middleburg, Florida ("the Farm Way property"). The other property was located at 10584 Haverford Street in Jacksonville, Florida ("the Haverford Street property"). Each time that Clifford agreed to act as a buyer, employees at Access E prepared all of the necessary paperwork. When it came time to sign the documents, Clifford did not read any of them, simply asking where he should sign. Once the loan was processed and approved, Clifford received a check for his investor fee.

After the purchase of thirteen pieces of property by seven different buyers, the FBI began to suspect that there was some fraudulent activity relating to loans processed by Access E. During the course of the FBI's investigation, Clifford was interviewed by Agent J. Douglas Mathews on June 18, 2010. Critically, Clifford confessed to knowing that the loan documents prepared on his behalf falsely claimed that he would be living in the properties, even though he had no intention of doing so. Clifford also admitted that these fraudulent statements were necessary in order to obtain a favorable loan from the mortgage company. Finally, he noted

4

that he had a substantial background in the real estate industry, including 13 years as a real estate broker.

At the close of the government's case, Clifford moved for a judgment of acquittal, arguing that there was insufficient evidence to support a conviction for conspiracy to commit mail and wire fraud.  The district court, however, reserved its decision on the motion and submitted the case to the jury.  After the jury found him guilty, the district court denied Clifford's motion for judgment of acquittal. He now appeals.

## II.

### A.

Clifford's first argument is that the district court should have granted his motion for a judgment of acquittal because there was insufficient evidence to support his conviction.  He specifically argues that there was no evidence at trial that he knowingly and willfully agreed to commit any wrongful acts.

"We review de novo a district court's denial of judgment of acquittal on sufficiency of evidence grounds."  United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007).  "In reviewing a sufficiency of the evidence challenge, we consider the evidence in the light most favorable to the Government, drawing all reasonable inferences and credibility choices in the Government's favor."  Id.  "A jury's verdict cannot be overturned if any reasonable construction of the evidence

would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Herrera, 931 F.2d 761, 762 (11th Cir. 1991). "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." United States v. Poole, 878 F.2d 1389, 1391 (11th Cir. 1989) (per curiam). But when the government relies on circumstantial evidence, the conviction must be supported by reasonable inferences, not mere speculation. United States v. Friske, 640 F.3d 1288, 1291 (11th Cir. 2011).

In United States v. Adkinson, 158 F.3d 1147 (11th Cir. 1998), we held that to sustain a conviction under 18 U.S.C. § 371, the government must prove: "(1) the existence of an agreement to achieve an unlawful objective; (2) the defendants' knowing and voluntary participation in the agreement; and (3) the commission of an act in furtherance of the agreement." Id. at 1153. The government need not prove that a defendant knew every detail of the conspiracy or participated in every stage of the conspiracy. United States v. McNair, 605 F.3d 1152, 1196 (11th Cir. 2010). However, the government must still prove beyond a reasonable doubt that each defendant had a "deliberate, knowing, specific intent to join the conspiracy." United States v. Cole, 755 F.2d 748, 755 (11th Cir. 1985) (quotation marks omitted).

6

As to the first Adkinson prong, Clifford acknowledges that there was sufficient evidence to establish the existence of an agreement to achieve an unlawful objective, which in this case was mail and wire fraud. Cooperating witnesses, including the mastermind of the scheme, Gregory W. Willson, testified that they agreed to submit fraudulent documents to mortgage lenders in order to obtain favorable interest rates on loans. Because many of these documents were mailed to lenders, and loan disbursements were frequently transmitted via wire transfer, there was also sufficient evidence to show that the use of the mail and wires was a significant part of the scheme.

Neither does Clifford appear to dispute that the third Adkinson prong was met in this case because the evidence certainly established that his actions furthered the conspiracy. Clifford signed both sets of closing documents for the Farm Way and Haverford Street properties after advising that the contents need not be explained to him. Clifford also admitted that his loan documents contained false information, and that he understood that the purpose of these false statements was to obtain a mortgage loan with a favorable interest rate. As a result, a reasonable jury could conclude that Clifford's agreement to serve as a buyer and his willingness to put his name on fraudulent loan documents furthered the goals of the conspiracy.

7

Clifford seems to center his argument on the second Adkinson prong.  While he acknowledges that he agreed with his son to serve as a buyer for two properties, Clifford argues that he did not know that the submission of false information or false documents played any part in his son's scheme.  Based on this premise, Clifford argues that the government's evidence only shows that his actions were negligent, not criminal.

Clifford's argument fails.  There was ample evidence at trial that would allow a jury to conclude that Clifford knowingly and voluntarily participated in the entire conspiracy, including the fraudulent portions of the scheme.  Clifford admitted during his interview with Agent Mathews that he was aware that his loan documents contained false statements regarding his intent to occupy the properties that he purchased.  Clifford also admitted that he understood that these false statements were necessary in order to obtain a mortgage loan with a favorable interest rate.  Prior to the closing for the Farm Way property, Clifford agreed to pay for the closing costs out of his own account (to be reimbursed later) so that the lender would be under the false impression that he was paying for the closing costs instead of Access E.  Finally, the jury also heard evidence that Clifford had been involved in the real estate business for many years, which would have added on to the evidence that he knew that he was participating in a fraudulent scheme.  Based on this evidence, a jury could reasonably infer that Clifford knew and agreed to

8

participate in the entirety of his son's scheme, including the parts of it that involved fraud.[3]

## B.

Clifford alternatively argues that, even if the evidence was sufficient to prove that he knowingly and willfully agreed to commit a wrongful act, it was not sufficient to establish that he was guilty of the conspiracy charged in the indictment, which involved a total of thirteen pieces of property purchased by seven different buyers. Rather, Clifford argues that the evidence only establishes a limited conspiracy involving the two properties that he purchased himself. He submits that there was no evidence establishing his connection to any of the other six buyers, nor that he knew that the other purchases involved the submission of fraudulent information to lenders.

Under this Court's precedent, Clifford's argument is properly viewed as an allegation of variance. "A material variance between an indictment and the government's proof at trial occurs if the government proves multiple conspiracies

---

[3] Clifford suggests that his conviction must be reversed because of the possibility that his loan documents were forged or altered before they were submitted. Clifford also emphasizes that one of the loan documents for the Farm Way property correctly stated that the property's intended use was for investment. These arguments fail on their face. Again, in reviewing a challenge to the sufficiency of the evidence, "we consider the evidence in the light most favorable to the Government, drawing all reasonable inferences and credibility choices in the Government's favor." Browne, 505 F.3d at 1253. This being the case, even though there may be some conflicting evidence in the record, there was certainly enough evidence for a reasonable jury to infer that Clifford knowingly and willfully agreed to participate in the conspiracy. See Poole, 878 F.2d at 1391 ("The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial.").

under an indictment alleging only a single conspiracy." United States v. Castro, 89 F.3d 1443, 1450 (11th Cir. 1996). "We will uphold the conviction unless the variance (1) was material and (2) substantially prejudiced the defendant." Id.

"To determine whether a variance was material, we look at the evidence in the light most favorable to the government and ask whether a reasonable trier of fact could have determined beyond a reasonable doubt that a single conspiracy existed." United States v. Seher, 562 F.3d 1344, 1366 (11th Cir. 2009). Three factors in particular are helpful in making this determination: "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." United States v. Edouard, 485 F.3d 1324, 1347 (11th Cir. 2007) (quotation marks omitted).

Even when this Court finds a material variance, however, it is still incumbent upon the defendant to demonstrate that his substantial rights were prejudiced by the variance. United States v. Calderon, 127 F.3d 1314, 1328 (11th Cir. 1997); United States v. Jones, 913 F.2d 1552, 1560 (11th Cir.1990) ("A variance between allegations and proof is reversible error only when it actually prejudices the defendant."). To demonstrate substantial prejudice, the defendant must show one of two things: (1) that the proof at trial differed so greatly from the charges that he was unfairly surprised and was unable to prepare an adequate defense; or (2) that there were so many defendants and separate conspiracies

before the jury that there is a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another. Id. at 1561.

Even if we assume a material variance between the indictment and the government's proof at trial, Clifford's argument fails because he is not able to establish that the variance prejudiced his substantial rights. He cannot claim unfair surprise because the alleged variance did not alter the crime charged, the requisite elements of proof, or the appropriate defenses in any significant way. See Jones, 913 F.2d at 1562. Indeed, Clifford's primary defense at trial was that he was unaware that his son's scheme involved fraud. This would have been his defense regardless of whether the indictment charged multiple conspiracies or a single conspiracy.

Neither can Clifford show that there is a substantial likelihood that the jury transferred evidence from one defendant to another. He was tried together with only one other person, who was acquitted by the district court before the jury ever received its instructions and began deliberating. Cf. United States v. Caporale, 806 F.2d 1487, 1501 (11th Cir. 1986) (holding that a case involving eleven defendants and two possible conspiracies was not so complex that there was risk of significant jury confusion). The district court also separately instructed the jury not to consider the evidence against Clifford's co-defendant in any way during its deliberations. As a result, Clifford cannot show that his substantial rights were

11

prejudiced by any variance between the indictment and the government's proof at trial.

## III.

For these reasons, we affirm Clifford's conviction.

**AFFIRMED.**