NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0163n.06

Case No. 22-5405

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Apr 12, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
|  | ) | |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE EASTERN DISTRICT OF |
| SUBHADARSHI NAYAK, | ) | KENTUCKY |
| Defendant-Appellant. | ) | OPINION |
|  | ) | |

Before: SUTTON, Chief Judge; LARSEN and DAVIS, Circuit Judges.

SUTTON, Chief Judge. Subhadarshi Nayak lied on government grant applications, prompting receipt of more than a million dollars in federal funds and generating three fraud convictions. Nayak does not challenge the fraud convictions. But he does appeal the district court's imposition of a restitution judgment equal to the amount of the fraudulently obtained funds. We affirm.

I.

Congress supports small businesses through a range of federal programs, including the Small Business Innovation Research and Small Business Technology Transfer initiatives. *See* 15 U.S.C. § 638. To "strengthen the competitive free enterprise system," these programs fund small business research and development efforts aimed at pioneering new products. *Id.* § 638(a).

Nayak and his wife, Jyoti Agrawal, owned and operated a small business, ScienceTomorrow, LLC. In 2012, the couple applied for and received a grant from the Department of Energy to research "scanning electron microscope[s]." R.80 at 4. A year later, the couple sought a larger "Phase II" grant. *Id.* To bring their request as close as possible to the grant cap, the couple inflated the budget for a proposed subcontract with the University of Tennessee by tens of thousands of dollars, leading to a $999,266 award. Despite representations to the contrary in the final project report, ScienceTomorrow never finalized a subcontract with the University.

Nayak and Agrawal were not good stewards of public funds. Nayak, who rotated on and off the project due in part to marital problems with Agrawal, received tens of thousands of dollars in salary. Agrawal used the grant for her own purposes, spending nearly $150,000 on an MBA.

ScienceTomorrow created a patent covering improvements to scanning electron microscopes. Under the terms of the grant, the government may use it without paying royalties. *See* 37 C.F.R. § 401.14(b). But it never has put the patent to use.

Nayak's marriage to Agrawal ended in 2016, but the fraud continued. He formed a second small business, Qmetry, and sought $100,000 from the Environmental Protection Agency to study soil pollutants. In the application, he falsely touted the assistance of a prominent professor, leading the agency to approve the award. Nayak used fraudulent invoices to draw down funds over the project period. After he submitted the final report, the agency transferred the remainder of the award to Qmetry.

When the government learned of the deception, Nayak pleaded guilty to one count of wire fraud conspiracy, 18 U.S.C. § 1349, and two counts of wire fraud, *id.* § l343. The district court granted a downward variance and imposed six months of incarceration and six months of home

2

confinement. Agrawal, by the way, received a 42-month sentence after a jury convicted her of wire fraud conspiracy, wire fraud, and money laundering.

The court held a separate restitution hearing for Nayak. The Department of Energy sought restitution equal to the full grant amount, explaining that ScienceTomorrow's fraud-tainted report lacked "scientific credibility." R.93-1 at 6. Testimony from an Environmental Protection Agency representative covered similar ground. With no way to verify that the promised research occurred or that the project report contained "truthful" data, the witness emphasized, Nayak's performance lacked any value to the agency. R.86 at 11.

Nayak offered a different take. He argued that the project reports and microscope patent created value for the government. He insisted that ScienceTomorrow and Qmetry legitimately carried out the promised research despite the fraudulent applications. And his patent agent testified that the patent had value, although he could not quantify the value and could not identify anyone who used the patent. Nayak added that unidentified scientists at unspecified laboratories expressed interest in the patent.

The court found that the final project reports and government rights in the patent lacked value, requiring a restitution judgment equal to the full amount of the government awards. The court imposed $1,099,266 in restitution, representing the $999,226 Phase II Department of Energy grant (jointly and severally with Agrawal) and the $100,000 Environmental Protection Agency award.

## II.

Under federal law, individuals who commit fraud must pay restitution to their victims. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). Restitution must be awarded "in the full amount of each victim's losses." *Id.* § 3664(f)(1)(A). The government bears the burden of proving the amount of

3

the restitution. *Id.* § 3664(e). Recognizing the difficulty of "attempting to calculate loss," *United States v. Ellis*, 938 F.3d 757, 760 (6th Cir. 2019) (quotation omitted), we reverse the district court's calculation only when left with a "definite and firm conviction that [it] committed a clear error of judgment," *United States v. Batti*, 631 F.3d 371, 379 (6th Cir. 2011) (quotation omitted).

Calculating loss under a fraud-tainted contract ordinarily requires subtracting the market value of the "legitimate services" provided from the contract price. *United States v. Robinson*, 872 F.3d 760, 780 (6th Cir. 2017). The parties skirmish over whether a different approach should apply to government grants. *Cf. United States v. Kozerski*, 969 F.3d 310, 313–16 (6th Cir. 2020) (distinguishing grants and contracts in calculating "loss" under the Sentencing Guidelines). But we leave that issue for another day. Even assuming that a restitution judgment must be reduced by the market value of the project reports and the patent, as Nayak urges, the district court did not err in concluding that they had only "negligible" value. R.71 at 19.

Two common-sense premises, grounded in federal law, guide today's review. One is that fraudulent research, like fraudulent evidence, can be worthless and sometimes even less than worthless. In some cases, it just lacks any probative value. *Cf. Allen v. United States*, 164 U.S. 492, 499–500 (1896) (endorsing instruction to "reject all evidence that you may find to be false; all evidence that you may find to be fabricated, because it is worthless"); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 94 (2d Cir. 2015) (noting that a study tainted by fraud "reveal[s] nothing, because [it is] utterly unreliable"). In other cases, such fraud can lead to calamity. *See, e.g.*, Hari Kumar et al., *Indian Drugs Are a Global Lifeline. For Dozens of Children, They Were Deadly*, N.Y. Times (Nov. 3, 2022). That's why, as the government's representative testified, only "truthful" research has value. R.86 at 17; *cf. Scirex*

*Corp. v. Fed. Ins. Co.*, 313 F.3d 841, 849 (3d Cir. 2002) ("When the employees falsified data in the studies, however, those studies became worthless.").

The other premise is that, where fraud pervades a project, the defendant's entire performance lacks value because none of it warrants trust and all of it deserves skepticism. *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304–05 (6th Cir. 1998); *Robinson*, 872 F.3d at 780–81 (affirming restitution award equal to full contract price despite defendant's provision of some "legitimate services"). As the agency representative asked Nayak at the restitution hearing and as Nayak never convincingly answered, "how do you know what to believe" once fraud permeates research? R.86 at 11.

Consistent with these considerations, abundant evidence supports the district court's conclusion that Nayak's projects lack value. Begin with the Department of Energy grant. ScienceTomorrow's application budgeted for a $300,000 subcontract with the University of Tennessee. But the company never entered into a contract with the University and never paid it any of the budgeted grant funds. The University as a result never provided the anticipated research assistance. Nor did ScienceTomorrow redeploy this funding to a cheaper subcontractor. To the contrary, when the project period ended, Agrawal retained more than $300,000. Unspent funds of this magnitude along with ScienceTomorrow's failure to engage a critical subcontractor provide ample grounds to doubt whether it performed the promised research.

How, moreover, could Nayak verify the research's legitimacy when he participated in only a fraction of it? His after-the-discovery-of-the-fraud assurances ring particularly hollow given Agrawal's misuse of grant funds, all while their marriage was unraveling, to pay for an MBA. ScienceTomorrow's fraud and poor recordkeeping render it impossible to know whether any legitimate research occurred under the grant. The district court did not err in concluding that this

5

uncertainty, combined with the absence of an important subcontractor and the retention and misappropriation of grant funds, rendered the project report unreliable and, all in all, valueless.

The same facts support the district court's attribution of negligible value to any government rights in the ScienceTomorrow patent. A patent does not legitimize fraudulent research. *See, e.g.*, Andrew Pollack, *Disgraced Scientist Granted U.S. Patent for Work Found to be Fraudulent*, N.Y. Times (Feb. 14, 2014); *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 270 (3d Cir. 2017) ("A patent's reissuance by the PTO does not bar a later finding that the patent was originally procured by fraud."); *Hoffmann-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1263–68 (Fed. Cir. 2003) (holding unenforceable a patent premised in part on an experiment that never took place); *see also* Jorge L. Contreras, *Patent Reality Checks: Eliminating Patents on Fake, Impossible and Other Inoperative Inventions*, 102 J. Pat. & Trademark Off. Soc'y 2, 3–5 (2021) (describing prevalence of patents based on fraudulent research). While Nayak and his patent agent insisted that the patent (and the subsidiary government rights) had value, the district court did not commit clear error in declining to credit this conclusory and unsupported testimony. Neither one of them could identify anyone who had used the patent. And neither one of them could quantify its value. Nayak's vague reference to interest in the patent by two scientists whose names he could not recall, whose research institutes he could not name, and whose use of the patent he could not describe, did not close this evidentiary gap.

Similar evidence supports the district court's conclusion that Nayak's fraud sufficiently tainted the Environmental Protection Agency's project to render the final report valueless. Uncertainty remains, it is true, over exactly how Nayak spent the project funds. But red flags appear everywhere. Start with the inexplicable timeline. Three months *after* submitting the final report to the agency, Nayak hired an electrical engineer to work on the project. Turn to the unspent

funds. Qmetry retained nearly $50,000 despite Nayak's certification that he spent the entire award. As the agency representative explained, the significant unspent funds made it "hard to know" whether Nayak "did anything." R.86 at 11. No clear error occurred on this front either.

Nayak persists that the district court should have calculated restitution as a percentage of the awarded funds, invoking cases involving corrupt employees. *See, e.g.*, *United States v. Skowron*, 529 F. App'x 71, 74 (2d Cir. 2013) (affirming restitution judgment equal to 20% of corrupt financier's salary); *United States v. Sapoznik*, 161 F.3d 1117, 1121–22 (7th Cir. 1998) (25% of corrupt police chief's salary). But in those cases, the corrupt employees unquestionably provided legitimate services to their employers alongside their criminal activities. Awarding a percentage of the employees' salary represented the best way to "rough[ly] approximat[e]" the value of the employers' loss. *Sapoznik*, 161 F.3d at 1122. Not so with Nayak, who provided nothing of value—at least nothing that has been shown or quantified to have value—to the government.

Nor does *United States v. Near* help him. 708 F. App'x 590 (11th Cir. 2017). In this out-of-circuit and unpublished decision, the defendants "legitimately performed research under [the] grants." *Id.* at 593. After the research concluded, they refused to pay their employees and subcontractors and kept the grant funds for themselves. *Id.* at 593–95. Because the defendants legitimately carried out the promised research, the Eleventh Circuit discerned no clear error in the district court's finding that the government (as opposed to the unpaid subcontractors) did not suffer a loss. *Id.* at 603–04. Here, in contrast, the district court reasonably concluded that Nayak's purported research lacked any discernible value.

We affirm.

7